# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION Case Number:
# 3:22-CV-439-RGJ
# Electronically Filed

**BROOKE THRELKELD**  PLAINTIFF
58 Newland Crescent
Charlottetown, PE C1A 4H7
Canada

v.  **COMPLAINT**

**NORTON HEALTHCARE LOUSIVILLE**  DEFENDANT
4967 US Highway 42, Suite 100
Louisville, KY 40222

  **Registered Agent**: Robert B. Azar
  4967 U.S. Highways 42, Suite 101
  Louisville, Kentucky 40222-6363

\* \* \* \* \* \*

Comes now the Plaintiff, Brooke Threlkeld (hereinafter "Plaintiff or " Dr. Threlkeld"), by and through counsel, and for her Complaint and causes of action against Norton HealthCare Louisville (hereinafter "Defendant" or "Norton") states as follows:

### JURSIDICTION/VENUE

1. At all times relevant to these claims the Plaintiff worked in Jefferson County, Kentucky.

2. The Plaintiff was employed by the defendant, Norton, at the University of Louisville Hospital.

3. Defendant Norton is a Kentucky corporation licensed and conduct business in Kentucky with its principal place of business located at 4967 US Highway 42, Suite 100, Louisville, Ky 40222.

4. Plaintiff's causes of action arise under 29 U.S.C. § 2612(a)(1)(A) and (D) specifically the Family Medical Leave Act ("FMLA"), in addition, her damages exceed the jurisdictional threshold requirement of FIVE THOUSAND DOLLARS ($5,000.00), and therefore, this Court has proper jurisdiction over the matter.

## FACTS

5. Dr. Threlkeld began her employment with the University of Louisville School of Medicine, Department of Pediatrics in December 2014 as an Assistant Professor.

6. In December 2019 Threlkeld's promotion to Associate Professor was approved by the School of Medicine Promotion, Appointment and Tenure Committee and subsequently by the U of L Board of Trustees in June 2020 effective July 1, 2020.

7. In October 2019 Dr. Threlkeld began her maternity leave through University of Louisville's FMLA.

8. In January 2020 Dr. Threlkeld returned to part time employment, which became fulltime shortly after.

9. In March 2020, Norton Healthcare integrated with UofL Department of Pediatrics. Dr. Threlkeld was told to sign final contracts that were incorrect within roughly 24 hours or else be terminated.

10. This kind of take it or leave it demand under duress forecasted things to come.

11. On March 23, 2020, Dr. Threlkeld had a known exposure to the COVID-19

virus.

12. She immediately contacted her supervisor, Dr. Le, about the exposure.

13. Per CDC and state guidelines, Dr. Threlkeld was supposed to quarantine for 14 days.

14. Dr. Le contacted employee health in order to inform and discuss the above.

15. Norton said that Dr. Threlkeld should keep working and having patient contact until she began to show symptoms.

16. Unwilling to jeopardize the health and safety of her pediatric patients, their guardians, her coworkers, and the community, Dr. Threlkeld, Dr. Le, Dr. Boland, and Dr. Multerer discussed this request and agreed that the Threlkeld should continue to work from home and initiate a likely 14-day quarantine period.

17. The next day Dr. Threlkeld began experiencing symptoms of COVID-19 including fever, headache, and body aches.

18. She told Dr. Le, who told Dr. Threlkeld to alert Norton employee health and follow their expected guidelines for illness management.

19. Dr. Threlkeld immediately proceeded with this request and Norton employee health placed her on furlough and requested that she go for testing at the Norton Respiratory Center downtown the following day. Dr. Threlkeld tested positive for COVID-19.

20. At this time Dr. Threlkeld was also charged and tested for Influenza A and B by employee health without her knowledge or consent.

21. Throughout her furlough/quarantine period, Norton forced Dr. Threlkeld to have daily contact with employee health.

22. Employee health spoke with Dr. Threlkeld by phone 17 times and left an additional 11 voicemails during this furlough period.

23. They demanded daily reporting of symptoms (temperature checks and symptom lists) and at least weekly repeat Covid-19 testing under the threat of termination.

24. At one-point Dr. Threlkeld was too ill to return an employee health call and within 4 hours employee health had notified her clinic manager by email of her lack of response, resulting in additional calls/texts to Threlkeld demanding symptom information.

25. Employee health required Dr. Threlkeld to take a temperature check, for example, while on the telephone and made known that a lack of reported fever required a return to in-person work even in the presence of other significant illness symptoms.

26. Additionally, Dr. Threlkeld was in communication with her supervisors, Dr. Le and Dr. Boland, on a near daily basis to update them of her symptoms and continued coverage of work responsibilities from home.

27. Seven days after her exposure, Employee Health ordered Dr. Threlkeld to come in for another COVID-19 test.

28. Dr. Threlkeld reasonably denied this request (with Dr. Le and Dr. Boland support) and provided documentation of her state mandated quarantine form requiring her to remain in her home until the state allowed otherwise (a minimum of 14 days at that time).

29. Dr. Threlkeld was expected to and did work from home throughout the course of this 21-day quarantine process.

30. It should also be noted that Dr. Le was sending frequent emails updating all Norton child behavioral health employees of Dr. Threlkeld's illness and employment status.

31. Ultimately, Dr. Threlkeld's mandated state quarantine was abruptly ended not when her symptoms remitted, as was initially recommended, but when Norton employee health communicated directly with the local health department to request a change in practice for Norton employees to hasten their return to work.

32. On April 12, 2020, Dr. Threlkeld tested negative for COVID-19 despite having continuing symptoms.

33. Because of the ongoing symptoms and continued state guidelines to work from home as able Dr. Threlkeld began to resume clinical work from home via telehealth.

34. Ultimately this was a highly successful practice.

35. Dr. Threlkeld had a 100% show rate which was far better than in-person practice.

36. Dr. Threlkeld was also able to continue to successfully manage all other non-clinical responsibilities via remote technologies.

37. On May 5, 2020, Norton told Threlkeld via Dr. Le that she must return to in person services the next day.

38. Dr. Threlkeld managed to negotiate the return date to May 11. On May 10th Threlkeld experienced a panic attack because of the stress of need to return to in person work despite still experiencing symptoms of COVID-19.

39. At this point it was unknown when people cease being contagious, and the

negative test conflicted with her physical symptoms.

40. Dr. Threlkeld was genuinely concerned about infecting her patients or being re-infected herself with COVID-19 or another contagious illness.

41. On the 11th she notified her supervisor that she would be unable to return to in person work due to her concerns.

42. After discussing with Dr. Le, the plan was changed. Dr. Threlkeld would continue to work remotely via telehealth until June 1, 2020.

43. Dr. Le asked Dr. Threlkeld to work with the Employee Assistance Program (EAP) to address her increased anxiety and the impact it was having on her life including her ability to return to in person employment.

44. Dr. Threlkeld recognized this disability and scheduled her initial appointment that day. At this time the Dr. Threlkeld supervisor consulted with their leadership team and reiterated that she must be back to fully in person work by June 1st.

45. On May 26, 2020, Dr. Threlkeld told Dr. Le her physical and mental health was deteriorating because of persistent COVID-19 "long haul" symptoms and stress related to the continued requirement to return to in-person clinical care in an environment where masking and physical distancing precautions were not universally mandated.

46. She told Dr. Le that her ethical obligations required her to take a leave of absence or modify her schedule and continue to work from home to seek medical treatment.

47. For over three weeks Dr. Threlkeld contacted multiple individuals within the Norton and U of L system attempting to begin a leave of absence or obtain formal

accommodations for illness before she could obtain leave.

48. During those three weeks, Dr. Threlkeld's health continued to deteriorate.

49. Despite this, Dr. Threlkeld continued to successfully work fulltime from home.

50. In a near 180, Norton HR was suddenly unreachable or working from home and unable to assist per one successful phone contact.

51. Dr. Threlkeld made numerous attempts to communicate with Norton but was almost entirely ignored.

52. On June 17 Dr. Threlkeld was told via email by Danielle Dresner Director, Pediatric Specialty Care Operations who to contact within U of L and Unum services for Norton to proceed with requesting a leave of absence.

53. Any accommodations for illness were not an option.

54. At this point Dr. Threlkeld had already communicated with Unum of her own volition to attempt to begin the process of requesting a leave.

55. On June 10, Unum incorrectly implemented a retroactive request for time which caused Dr. Threlkeld to lose 20 days of vacation time but never receive the approximately $1,800 that should have been granted to her.

56. Unum reclassified her medical COVID-19 furlough as FML/STD, despite this being an inappropriate classification of her leave.

57. On June 15 Dr. Threlkeld received an email from her boss informing her that she would not receive her previously guaranteed raise.

58. Norton again gave Dr. Threlkeld 24 hours to sign a new contract with a raise sum well below what was previously agreed upon for an Associate Professor

Psychologist or receive no raise at all.

59. Then on June 22 Dr. Threlkeld's 6-week LOA began when she was diagnosed with a stress related mental health disorder.

60. On June 26 Dr. Threlkeld did not receive any payment from Norton and her attempts to request clarification re: Norton pay, or lack thereof were ignored by HR and Danielle Dresner.

61. August 26, 2020, Dr.Threlkeld received the first notification from her supervisor and U of L detailing her access to paid leave and long-term leave options as well as the contact information for the director of HR at Norton.

62. This was three months after Threlkeld was attempting to contact HR to obtain these resources.

63. On August 28, 2020, Dr. Threlkeld spoke with Norton HR Director, Judy Settle, by phone to discuss Norton processes for accommodations and leaves and followed up by email with her on August 30 but received no reply and no assistance despite Settle's assurance that she would follow up to address Threlkeld's questions.

64. On September 2, 2020, Dr. Threlkeld received a call from her supervisor to inform her that her position of academic leadership was being replaced by a colleague, thus terminating 35% of her job duties.

65. She was also informed that Norton had begun recruitment for another psychologist to work in Child Neurology, which would replace the remaining 65% of her job duties. These employment changes effectively replaced Threlkeld while she was still on FML.

66. Two days later Dr. Threlkeld received text messages from the Norton

Leadership team member Danielle Dresner informing Dr. Threlkeld for a second time, falsely, that she had not properly submitted her leave documents.

67. As another Norton leadership member, Susan Friedrich, had done on July 10th, Dr. Threlkeld's job was threatened again, despite her having explained to multiple individuals on several occasions, with corresponding documentation that she had followed all requested leave documentation protocols.

68. Dr. Threlkeld explained this situation again, and that she was not being paid properly.

69. During this time, Dr. Threlkeld was diagnosed with Post Traumatic Stress Disorder due to the trauma thrust upon her by Norton and U of L abusive actions.

70. On November 11, 2020, Dr. Threlkeld was in a virtual meeting with Dr. Le, Dr. Boland, and Susan Fredrich to plan next steps when her present leave plan ended on January 1, 2021.

71. Dr. Threlkeld was informed on this call that no additional leave requests would be granted, regardless of the validity of the requests.

72. For that reason, she was given the option of starting long-term disability, which was unnecessary due to the fact that she was able to work with minimal accommodations. However, Dr. Threlkeld had no need to be on long-term disability and ultimately was given the option of returning to her in person role, without her leadership position, and no accommodations, or she should resign.

73. At that time, after being informed that Norton and U of L would deny any proper requests for leave or accommodations, Dr. Threlkeld told the present employers that she would not be able to return to work under such illegal conditions.

74. As a result of these illegal and retaliatory employment actions Dr. Threlkeld was deprived of months of her salary, a pay raise, and her career as a pediatric psychologist.

## COUNT I: FMLA

75. The FMLA entitles eligible employees up to twelve weeks of unpaid leave during any twelve-month period for, among other things, a serious health condition that makes the employee unable to perform the functions of the position of such employee. 29 U.S.C. § 2612(a)(1)(A) and (D).

76. An employer is also expressly prohibited from discriminating or retaliating against an employee because she asserts her rights under the FMLA.

77. Similar to retaliation under the KCRA, a *prima facie* case of FMLA retaliation requires a plaintiff to show that (1) she engaged in conduct protected by the Act, (2) her employer was aware of this exercise of protected rights, (3) her employer took an employment action adverse to her, and (4) there was a causal connection between the protected activity and the adverse employment action. *See Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)).

78. Again, analogous to the KCRA, a court will apply the *McDonnell Douglas* framework to an FMLA retaliation claim based on indirect evidence. *Skrjanc*, 272 F.3d at 315.

79. Dr. Threlkeld exhausted her FMLA rights. She used her full 12 weeks of unpaid leave for her serious health conditions.

80. Dr. Threlkeld is able to establish a causal connection between her use of her FMLA resources (a protected activity) and her termination because U of L and Norton made this apparent by giving her an ultimatum between returning to full in person work or resign.

81. They also clearly told her that she would not be eligible for any accommodations or leave time in the future.

82. As stated, Dr. Threlkeld was successfully completing all of her job duties while working remotely.

83. Despite her success and ability, she was forced to resign, or face exacerbated physical and mental health detriments.

84. U of L and Norton willfully violated Dr. Threlkeld's rights in utilizing FMLA without reprisal or retaliation.

85. As a result of Dr. Threlkeld exercising her right to FMLA she was subjected to adverse employment action up to and including termination.

## **PRAYER FOR RELIEF**

The Plaintiff, Dr. Threlkeld hereby incorporates all preceding paragraphs as if fully set forth with particularity herein.

WHEREFORE, Dr. Threlkeld, Prays that this Court:

(a.) Declare Defendant's conduct in violation of Plaintiff's right;

(b.) Award Plaintiff compensatory damages in such amounts as shall be proven at trial for her economic, personal, and other losses;

(c.) Award Plaintiff damages in an amount to be proven at trial for the humiliation, embarrassment, apprehension about his future, emotional stress, and mental

anguish, which the Defendants caused Plaintiff by their illegal, discriminatory, and wrongful acts toward her;

(d.) Award Plaintiff damages in an amount to be proven at trial for the wrongs Defendants committed against Plaintiff because of their illegal, discriminatory, and wrongful acts towards her;

(e.) Instruct all Defendants and all of its past current and future employees that they are barred from retaliating against Dr. Threlkeld by any and all mediums, including but not limited to internet, Social Media remarks, filling frivolous complaints to any medical board, encouraging others to make disparaging or negative comments or remarks against her or her practice.

(f.) Award Plaintiff costs, interest, and attorneys' fees pursuant to KRS §344; and

(g.) Grants her such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs, Dr. Threlkeld demands a jury to try all issues triable by jury.

Respectfully submitted,

/s/ Marylin "Linsey" Shrewsbury
Marylin "Linsey" Shrewsbury
NELSON, MCDONLAD & SHREWSBURY
256 Commerce Street
P.O. Box 1226
Eddyville, Kentucky 42038
Telephone: (502) 303-5228
Email: Linsey@nmslawgroup.com

John S. Friend
Friend Law PSC
4207 Southern Pkwy
Louisville Kentucky 40214
johnny@friendlawky.com