UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

BROOKE THRELKELD                                              Plaintiff

v.                                                       Civil Action No. 3:23-cv-439-RGJ

NORTON HEALTHCARE LOUISVILLE                Defendant

\* \* \* \* \*

**MEMORANDUM OPINION & ORDER**

Defendant, Norton Healthcare Louisville ("Norton"), moves for summary judgment on Plaintiff Brooke Threlkeld's ("Threlkeld") claim for retaliation under the Family and Medical Leave Act (FMLA). [DE 34].[1] Threlkeld responded [DE 35] and Norton replied [DE 36]. This matter is ripe. For the reasons below, Norton's Motion for Summary Judgment [DE 34] is **GRANTED**.

### I.    BACKGROUND

Threlkeld is a licensed clinical psychologist and academic professional. [DE 35 at 292]. Prior to March 1, 2020, Threlkeld was an Assistant Professor in the University of Louisville ("UofL") School of Medicine's Department of Pediatrics (the "Department of Pediatrics"). [DE 34-2 at 115].

#### A.  2020 Merger

On March 1, 2020, a merger agreement between UofL and Norton ("2020 Merger") established the Norton Children's Medical Group ("NCMG"). [*Id.*]. Pursuant to the 2020 Merger, the Department of Pediatrics' faculty "became dually employed" by UofL and Norton. [DE 34-4

---

[1] Although Counsel for Norton attached a Memorandum of Law in Support of the Motion for Summary Judgment [DE 34-2], the Joint Local Rules for the Eastern and Western Districts of Kentucky contemplate a single, unified motion and memorandum. *See* Local Rule 7.1. Going forward, Counsel is requested to file a unified motion.

at 265]. Following the merger, Threlkeld was designated a ".65 clinical full-time equivalent" ("FTE") with Norton at the direction of NCMG, and was a ".35 FTE with the University of Louisville." [DE 35-3 at 427; DE 34-4 at 265–66]. Because Norton contracted Threlkeld at .65 FTE, Norton was considered her primary employer and was responsible for her benefits, including any leave she was entitled to under the FMLA. [DE 34-2 at 124].

### B. Medical Leave Due to COVID-19

On March 23, 2020, Threlkeld reported a known exposure to COVID-19 from a family member and began experiencing symptoms the following day. [DE 34-2 at 117]. Threlkeld's supervisor advised her to contact the "Employee Health" department pursuant to Norton's directives concerning symptomatic employees at the time. [*Id.*]. Employee Health placed Threlkeld on furlough, requested she go for confirmation testing, and advised her of additional procedures for illness management, including daily monitoring of temperature and symptoms by Employee Health. [*Id.*]. Norton retroactively approved Threlkeld for FMLA leave between March 25, 2020, and April 14, 2020. [*Id.* at 118]. Threlkeld resumed clinical work from home on or around April 15, 2020, via telehealth. [*Id.*].

On or around May 5, 2020, Norton notified all child psychiatry and psychology providers and staff, including Threlkeld, that in-person work would resume between May 6, 2020, and May 11, 2020. [*Id.*] However, on May 11, 2020, Threlkeld notified her supervisor that she could not return to the office due to increased anxiety surrounding her return to the office. [*Id.*]. Norton extended approval for Threlkeld to continue to work via telehealth until June 1, 2020. [*Id.*]. By the end of May, Threlkeld notified Norton that due to health concerns she needed to either take a leave of absence or continue to work from home. [*Id.* at 119].

Threlkeld took a leave of absence from June 22, 2020, until January 2, 2021, nearly 28 weeks in total. Threlkeld was initially approved for additional FMLA leave until July 17, 2020. [DE 34-3 at 220]. Threlkeld subsequently requested and received approval for an extension of leave from July 18, 2020, until September 15, 2020. [DE 34-2 at 119]. On September 14, 2020, Threlkeld was informed that August 21, 2020 was her "last day of protected leave under the FMLA leave." [DE 34-3 at 221]. Accordingly, her leave approval was "extended from July 18, 2020 through August 21, 2020 for FMLA leave on a full/continuous schedule and August 22, 2020 through September 15, 2020 for Norton Non FMLA leave on a full/continuous schedule." [*Id.*]. Norton later extended Threlkeld's "Non FMLA" leave from September 16, 2020, until October 16, 2020. [*Id.* at 226]. On November 2, 2020, Norton informed Threlkeld that October 16, 2020 was her "last day of protected leave under the Norton Non FMLA leave." [*Id.*]. From October 16, 2020, until January 2, 2021, Norton provided Threlkeld "unspecified medical leave." [DE 34-2 at 120].

Prior to taking leave, in June 2020, Threlkeld was awarded a raise effective July 1, 2020. [*Id.* at 128]. However, due to her leave of absence, Threlkeld stopped receiving a salary from Norton prior to July 1, 2020. [*Id.*] Also during this time, Threlkeld learned that she would be replaced as the Training Director of the UofL's Child Clinical/Pediatric Psychology Predoctoral Internship Program and that Norton was attempting to hire another pediatric neurology psychologist. [*See* DE 34-2 at 128–29; DE 1 at 8]. Threlkeld was told, however, that the additional pediatric neurology psychologist "would be in addition to her," not a replacement. [DE 34-2 at 129].

### C. Resignation and Legal Action

On November 11, 2020, Threlkeld met with her Norton supervisors to discuss her employment after her period of approved leave ended on January 2, 2021. [DE 34-2 at 121]. Norton instructed Threlkeld that her options were "[1] long-term disability . . . [2] return to in-person work, or [3] resignation." [DE 34-2]. Norton rejected Threlkeld's requested accommodation that she be allowed to continue to work remotely from home and did not offer alternate accommodations. [DE 34-3 at 163].

On December 30, 2020, Threlkeld submitted her resignation, effective January 2, 2021:

> After much consideration, I am unable to continue to my employment with Norton and UofL. I do not feel that Norton Healthcare appropriately prioritizes patient/provider safety or wellbeing. The accommodations and support I requested early in my illness related to COVID-19 were reasonable and appropriate, and I demonstrated the ability to do my job with them in place. I am also very discouraged by a general lack of support and communication from Human Resources and team leadership or willingness to engage in dialogue about employment expectations or accommodations that would allow me to remain employed in a manner that prioritizes safety and wellbeing. Given these circumstances I have no choice but to resign.

[DE 35-11].

On August 25, 2022, Threlkeld commenced this action against Norton, alleging one count of FMLA retaliation. [DE 1 at 10].

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The essential inquiry is "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

The movant has the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (discussing FED. R. CIV. P. 56(e)). "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan*, 342 F.3d at 497 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(B).

It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (1986). Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (alteration in original) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)) (internal quotation marks omitted). If

5

the nonmoving party does not respond with specific facts showing a genuine issue for trial, summary judgment is appropriate. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989).

### III. ANALYSIS

Norton asserts that Threlkeld's claims fail as a matter of law for two reasons. First, Norton contends that Threlkeld was not entitled to FMLA leave from Norton in the first place, and therefore, Norton could not have retaliated against her. [DE 34-2 at 125]. Second, Norton argues that Threlkeld cannot meet her burden of production to establish a prima facie case of retaliation under the *McDonnell Douglas* framework. [*Id.*].

#### A. FMLA Eligibility and Estoppel

According to Norton, Threlkeld was ineligible for FMLA leave "because she had not been employed for at least 12 months and for at least 1,250 hours of service with Norton." [*Id.* at 124]. Moreover, Threlkeld "had exhausted her FMLA allotment for the year prior to her employment with Norton" when she took "almost 12 weeks of [FMLA] leave" after the birth of her child. [*Id.* at 124–25]. Threlkeld disputes that she was ineligible and claims that her employment at UofL prior to the merger counts toward FMLA eligibility. [DE 35 at 299 (citing 29 C.F.R. § 825.106 and § 825.107)]. In any event, Threlkeld maintains that Norton is estopped from raising her ineligibility as defense because "Norton *itself* processed her as FMLA-eligible, repeatedly approving her FMLA and Non-FMLA leave, subjecting her to the FMLA leave process, and maintaining her benefits." [*Id.* (emphasis in original)].

Threlkeld is correct that Norton may not raise Threlkeld's FMLA ineligibility as a defense if Threlkeld can show that Norton is equitably estopped from doing so. In the FMLA context, the Sixth Circuit applies the traditional test for equitable estoppel. *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 557 (6th Cir. 2009). Accordingly, Threlkeld must show (1) a definite

misrepresentation as to a material fact, (2) a reasonable reliance on the misrepresentation, and (3) a resulting detriment to the party reasonably relying on the misrepresentation. *Id.*

Viewed in "the light most favorable to [Threlkeld]," *Sagan*, 342 F.3d at 497, the evidence set forth in Norton's Motion for Summary Judgment establishes all three elements. It was Norton that first retroactively placed Threlkeld on FMLA leave following its decision to furlough her. [DE 117–18]. Norton's leave administrator, Unum, then sent Threlkeld a letter explaining that her leave from March 25, 2020 to April 14, 2020 was "mistakenly approved under Norton Non FMLA" but should have been FMLA approved leave. [DE 34-3 at 210]. The letter represented that Threlkeld had "9 week(s), 0 hour(s), and 0 minute(s) of federal FMLA leave remaining." [*Id.* at 211]. Unum subsequently represented that Threlkeld's leave was "approved from June 22, 2020 through July 17. 2020" and was "extended from July 18, 2020 through August 21, 2020 for FMLA leave on a full/continuous schedule." [DE 34-3 at 221].

Next, unlike the plaintiff in *Dobrowki*, there is evidence that Threlkeld did rely on the representations that she was FMLA-eligible. *Compare Dobrowski*, 571 F.3d at 557 (rejecting estoppel argument because there was no evidence in the record to show that plaintiff relied on the belief that his leave would be FMLA-protected). In May 2020, Threlkeld "expressed the belief that she needed to either take a leave of absence or continue to work from home" and her superiors "permitted [her] to continue to work from home . . . while she pursued a leave of absence." [DE 34-2 at 119]. In other words, Threlkeld's decision to take FMLA leave was contingent on Norton's approval of that leave. Norton (through Unum) finally approved Threlkeld for FMLA leave in June 2020. [*Id.*] Threlkeld's reliance on this approval was reasonable and Norton makes no argument to the contrary. Indeed, Norton concedes that its decision to "gratuitously award[] Dr. Threlkeld

7

with this leave time . . . may estop Norton from relying upon Dr. Threlkeld's ineligibility as a defense to her FMLA retaliation claim." [DE 36 at 628].

Finally, assuming Threlkeld was not eligible for FMLA leave, there is sufficient evidence that her reliance on Norton's contrary misrepresentations was to her detriment. It is enough that Norton now seeks to raise her alleged ineligibility as a defense to her attempt to enforce rights she believed she had under the FMLA. Threlkeld has therefore shown that a genuine dispute exists as to whether Norton is estopped from arguing that she was ineligible for FMLA. Thus, even if Norton's assertion that "Threlkeld *almost certainly* exhausted the 12 weeks of leave provided to her under the FMLA" were enough to warrant summary judgment on that issue, a jury would still need to decide whether equitable estoppel bars this defense. [DE 34-2 at 125 (emphasis added)].

Regardless, the record does not support that Threlkeld had exhausted her FMLA leave. Norton cites two "Personnel Recommendations" from UofL which document Threlkeld's parental FMLA leave. [DE 36 at # (Exhibits 8 and 9)]. Based on these records, it appears Threlkeld took *10 weeks*—not 12 weeks—of FMLA leave across two periods, from October 15, 2019 to November 25, 2019 and from January 2, 2020 to January 31, 2020, respectively. [*See* DE 34-10 at 287–89]. As a result, Norton's argument that Threlkeld was ineligible for FMLA leave fails on summary judgment.

### B. *McDonnel Douglass* Framework

Threlkeld's sole claim is that Norton retaliated against her for taking FMLA leave. The FMLA prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). At summary judgment, this Court applies the familiar burden-shifting test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to retaliation claims under the FMLA.

8

*See Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) *(*citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313–16 (6th Cir. 2001) and applying the burden-shifting analysis to an FMLA retaliation suit). *See also Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 379 (6th Cir. 2017) ("The *McDonnell Douglas* burden-shifting framework applies to claims of FMLA retaliation based on indirect evidence.").

> To make out a prima facie case of retaliation, Threlkeld must show that
>
> (1) she was engaged in an activity protected by the FMLA; (2) [Norton] knew that she was exercising her rights under the FMLA; (3) after learning of [her] exercise of FMLA rights, [Norton] took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006).

If Threlkeld satisfies these requirements, the burden shifts to Norton to proffer a legitimate, nondiscriminatory rationale for discharging her. *Edgar*, 443 F.3d at 508. To overcome a proffered, non-retaliatory reason, Threlkeld must point to competent evidence from which a reasonable jury could conclude that the stated reason is pretextual. *See id*. To do so, Threlkeld can show either "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (citation modified). In other words, Threlkeld "must show that the employer's stated reason for terminating her was pretextual and that the true reason for her dismissal was her medical leave." *Killian*, 454 F.3d at 556.

Here, there is no dispute that Threlkeld satisfies the first two elements of her prima facie case. As explained above, Threlkeld applied for FMLA leave and took such leave after receiving approval from Norton's leave administrator. Norton disputes only the last two factors, arguing that

9

Threlkeld is unable to demonstrate either that "she suffered an adverse employment action," [DE 34-2 at 129], or "a causal connection between her FMLA leave and her alleged termination." [*Id.* at 132]. Failure to satisfy either of these elements is fatal to Threlkeld's retaliation claim.

> i. *Adverse Employment Action*

To establish an adverse employment action, Threlkeld must show "[a] significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). A change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 886 (1996) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).

The inquiry is case-specific. Factors courts consider in determining whether an employment action was materially adverse include: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.*

Finally, even when a plaintiff is not terminated and instead resigns, their resignation may qualify as an adverse employment action if the plaintiff can show that they were constructively discharged. To demonstrate a constructive discharge, Threlkeld "must adduce evidence to show that 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014) (citations omitted).

Threlkeld alleges several different actions which she believes constitute an adverse employment action as a result of her taking FMLA leave. She argues that (1) she was stripped of her leadership position at UofL; (2) her clinical duties at NCMG were "replac[ed]"; (3) Norton "refus[ed] to provide further accommodation" that would allow her to continue working; (4) she was denied a "previously confirmed pay raise"; and (5) she was constructively discharged when Norton presented her with an "ultimatum" requiring her to either apply for long-term disability, return to in-person work, or resign. [DE 35 at 301].

With respect to Threlkeld's claim that she was stripped of her leadership position at UofL, Threlkeld has not shown that Norton—rather than UofL—was responsible for taking that action. In contrast, Norton submitted the Affidavit of Susan Strack ("Strack"), the "System Vice President for Pediatrics" at Norton. [DE 34-4 at 264]. Strack's testimony was that "Norton did not have any input or decision making authority related to Dr. Threlkeld's academic leadership position." [*Id.* at 266]. Because Threlkeld offers no evidence to rebut Strack's affidavit, her conclusory allegations alone do not give rise to a genuine dispute of fact.

Similarly, Threlkeld has not met her burden to show that her clinical duties were replaced. In fact, the record shows the opposite. When Threlkeld learned that Norton was recruiting a new clinical child psychologist, Threlkeld was told by her supervisor, Dr. Jennifer Le, that "[t]he recruit for neurology does not take your place, it is in addition to." [DE 34-3 at 195]. Threlkeld was never told that her clinical responsibilities would be reduced or that her role with Norton would change at all. Significantly, when Threlkeld was told that she needed to return from her leave, one of her options was to "go back to work at full capacity as if nothing ever happened." [DE 35 at 297]. In other words, Threlkeld's understanding of Norton's return offer was that she would be restored to her prior position—exactly what the FMLA requires and protects. 29 U.S.C. § 2614(a)(1).

11

Although news that she would no longer be the only clinical child psychologist may have felt like a "hit," [DE 34-3 at 195], to succeed on her retaliation claim Threlkeld must show more than "mere inconvenience or an alteration of job responsibilities" or a "bruised ego." *Kocsis*, 97 F.3d at 886 (explaining that "even demotions" without salary or work hour changes do not ordinarily constitute adverse employment decisions).

Threlkeld also fails to show that Norton denied her a raise to which she was entitled. The record shows that Threlkeld executed a "First Addendum to Physician Employment Agreement" on June 22, 2020 which provided that she would receive a raise "[e]ffective July 1, 2020." [DE 34-12 at 291]. Although Norton argues that the FMLA does not guarantee "the accrual of any seniority or employment benefits during any period of leave," [DE 34-2 (quoting 29 U.S.C. § 2614(a)(3)(A))], it is at least arguable that Threlkeld's right to the raise accrued prior to her taking leave. Nevertheless, Threlkeld has not shown that Norton had the opportunity to implement the raise but failed to do so. Threlkeld went on leave before the raise could take effect and never returned, during which time she received income through her short-term disability benefits but did not receive any salary from Norton.

In contrast, Threlkeld has shown that she requested accommodations she believed would allow her to continue working at Norton despite her COVID-related disability. And there is no question that when Threlkeld's leave was set to expire on January 2, 2021, she was offered an ultimatum—return to office, go on long-term disability, or resign. The only question that remains is whether either of these allegations constitute an adverse employment action alone or, taken together, whether they amount to a constructive discharge.

While Threlkeld alleges Norton refused her repeated requests for "reasonable accommodations," the only accommodation she identifies which Norton denied her was her

12

request to continue working remotely. [DE 35 at 297]. Threlkeld does not dispute Strack's affidavit stating that Norton offered other accommodations for Threlkeld to return to in-person work prior:

> I worked with Dr. Jennifer Le, Division Chief and Dr. Kim Boland, Department of Pediatrics Chair and Chief of Staff of Norton Children's Hospital to address Dr. Threlkeld's concerns and accommodate her return to the office. . . . Several of these accommodations included masking procedures, ensuring access to spacious places to provide face-to-face patient care, and access to vaccinations quickly upon availability. . . . The only accommodation Dr. Threlkeld was interested in was continued ability to work from home via telehealth.

[DE34-4 at 267]. When Norton met with Threlkeld in November 2020 to discuss her return from leave, Threlkeld "refused to return to in person work on January 2, 2021, and continued to insist the only acceptable accommodation for her was continued, indefinite remote work." [*Id.* at 34-4].

Threlkeld's only argument as to why Norton's refusal to allow her to continue teleworking constitutes an adverse employment action is, essentially, that the decision was arbitrary. Specifically, Threlkeld claims that the "[t]he ridiculousness of Norton requiring in person faculty to come to work at the hospital or campus in order to **engage in remote clinical appointments** is astounding. They wanted her to show up at a building to do the exact same thing she had been doing- very successfully- at home." [DE 35 at 302 (emphasis in original)]. Yet Threlkeld does not explain or cite any authority showing how even an arbitrary decision such as this may be actionable as an adverse employment action in an FMLA retaliation claim.[2] Assuming *arguendo* that an employer's refusal to accommodate an employee could be characterized as an adverse employment action in the FMLA context, Threlkeld has still failed to show that Norton's refusal in this case amounts to "a *materially* adverse employment action." *Kocsis*, 97 F.3d at 886 (emphasis added).

---

[2] That does not mean that Norton's refusal could not be actionable in the context of a claim for disability discrimination. The Court notes that Threlkeld has brought claims against Norton for disability discrimination in a related case pending in Jefferson Circuit Court. *See Brooke Threkeld v. Norton Healthcare Louisville*, 22-CI-004408.

Likewise, Threlkeld has not produced evidence showing that she was constructively discharged. In her resignation letter, Threlkeld stated she had "no choice but to resign" because Norton refused to provide accommodations which she felt were "reasonable and appropriate." [DE 35-11 at 616]. True, Threlkeld was permitted to work remotely prior to taking FMLA leave, and this permission was taken off the table in Norton's return ultimatum. Viewed in a light most favorable to Threlkeld, the record shows that Norton offered Threlkeld the choice between resignation and "continued employment on terms less favorable than the employee's former status." *Laster*, 746 F.3d at 728 (listing factors the court considers when determining whether the first prong of the constructive discharge inquiry has been met). Threlkeld also points to "unrelenting demands for [COVID] reporting, threat of termination during serious illness [], loss of key duties [], arbitrary pay changes, [and] documented efforts to restore duties rebuffed or ignored[]. . . ." [DE 35 at 302]. At this stage, the Court is satisfied that Threlkeld could show Norton "deliberately created intolerable working conditions, as perceived by a reasonable person." *Id.* Crucially, however, Threlkeld cannot satisfy the second prong of *Laster* because she identifies no evidence that Norton "did so with the intention of forcing [her] to quit." *Id.*

Indeed, the record shows that Norton wanted Threlkeld to return to work in-person, not resign. [*See, e.g.*, DE 35-1 at 324 (Threlkeld explaining that "Employee Health was very much motivated to get [her] back to work"); DE 35-8 at 461 (email from Dr. Le stating "I will fight tooth and nail to ensure that your position remains your position until you tell me you don't want it"). Threlkeld herself acknowledged that Norton's Non FMLA policy provided that "[a]fter 12 weeks [her] position could be filled and [she] would not be able to return to that position." [DE 35-11]. When that leave expired, Norton was free to terminate her under the FMLA but instead offered her the option to "go back to work at full capacity as if nothing ever happened." [DE 34-3 at 163].

14

> ii. *Causal Connection*

Even if Threlkeld could show constructive discharge, her claims would still fail because "the record contains no evidence establishing a causal connection between [Threlkeld's] medical leave and her termination." *Killian*, 454 F.3d at 556. As noted in Norton's motion, "her alleged termination or forced resignation did not occur until November 11, 2020, approximately eight months after her original FMLA leave in March 2020, five months after she was approved and receiving additional FMLA leave in June 2020, and three months after she exhausted her 12 weeks of FMLA leave." [DE 34-2 at 130]. Nothing in the record suggests that Norton took any adverse actions because of Threlkeld's decision to take FMLA leave. Rather, the record shows that Threlkeld was forced to resign, if at all, "not . . . because she departed," but "because she failed to return" to in-person work. *Killian*, 454 F.3d at 556.

To resist this conclusion, Threlkeld recites vague allegations which she claims "justify[] a strong inference of causal connections for the jury," namely:

> [t]he sequence of administrative confusion, increased scrutiny, threats regarding pay and compliance, removal of duties, and the forced resignation occurred in close temporal proximity to her invocation of protected leave, justifying a strong inference of causal connection sufficient for the jury.

[DE 35 at 301]. Yet the only citation Threlkeld makes to the record reflects, at most, "administrative confusion" regarding Threlkeld's leave. [*See id.* (citing DE 35-1 at 336 (describing unanswered questions about "short term disability vs FMLA vs Vacation and sick time"))]. As explained above, there is no evidence that Norton denied Threlkeld pay or that Norton intended for her to resign. In sum, Threlkeld does not explain how a jury could infer a causal connection between Threlkeld's leave and the alleged forced resignation based on evidence in the record. As such, the Court declines to find one.

15

Accordingly, the Court finds that Threlkeld is unable make out a prima facie case of FMLA retaliation and Norton is therefore entitled to judgment as a matter of law.

### IV.     CONCLUSION

For the reasons discussed herein, having considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS:**

(1)  Norton's Motion for Summary Judgment [DE 34] is **GRANTED**.

(2)  A separate judgment will be entered accordingly.

*Rebecca Grady Jennings, District Judge*
United States District Court

December 4, 2025

cc: counsel of record